**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**NORTHEASTERN DIVISION**

**FILED**

02 NOV 27 PM 4: 24

U.S. DISTRICT COURT
N.D. OF ALABAMA

CONSTANCE L. JONES,               )
                                  )
    **Plaintiff,**               )
                                  )
**vs.**                           )        Civil Action No. CV-01-S-0593-NE
                                  )
AZAR, INC., d/b/a THE HUNTSVILLE  )
MARRIOTT, and MATT COMSTOCK,      )
                                  )
    **Defedants.**              )

**ENTERED**

NOV 2 7 2002

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA

**MEMORANDUM OPINION**

    Plaintiff, Constance L. Jones, is an African American female who alleges that her former employer, Azar, Inc., doing business as the Huntsville Marriott Hotel ("Azar"), subjected her to a racially hostile work environment, and later retaliated against her for complaining about that environment, all in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981.[1] Plaintiff also asserts a state law claim of assault and battery against a former employee of Azar, defendant Matt Comstock ("Comstock").

    The case presently is before the court on defendants' motions for summary judgment. Federal Rule of Civil Procedure 56(c) provides, in part, that summary judgment not only is proper, but "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient

---

[1] Plaintiff's brief opposing summary judgment, at 1. Plaintiff's original complaint also stated claims for discriminatory discharge, failure to promote, gender discrimination, and negligent retention, but she expressly abandoned those claims at the summary judgment stage. *Id.* at 1, note 1.



to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986).

> In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment.
>
> The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)); *see also United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (en banc).

Upon consideration of the pleadings, evidentiary submissions, and briefs, the court concludes that Azar's motion for summary judgment should be granted in part and denied in part. Comstock's motion for summary judgment will be denied.

## I. SUMMARY OF FACTS

Azar is a corporate entity headquartered in Ft. Wayne, Indiana. It manages several hotels and restaurants, including the Huntsville Marriott.[2]  The hotel is operated by an Executive Committee, the members of which include the General Manager, Controller, Director of Sales, Director of Operations, Director of Services, Front Office Manager, Chief Engineer, and Director of Human Resources.[3]  Three persons served as General Manager of the Huntsville Marriott during the period relevant to this suit: *i.e.*, Steve Ragsdale is the current General Manager, having assumed

---

[2] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 28.

[3] *Id.* at 41, 43-44.

-2-

that position on October 4, 1999;[4] Cindy Reid briefly served, for seven months prior to Ragsdale's appointment, as both Controller and Acting General Manager;[5] and, for "approximately six or seven years" prior to Reid, Kevin LaTone was the General Manager.[6] Jane Rollins was Azar's Corporate Director for Human Resources from mid-1998 to September of 2001.[7] Defendant Matt Comstock was the hotel's Chief Engineer from August 10, 1998,[8] until his termination on June 18, 1999.[9]

Plaintiff was employed by Azar as a part-time security guard at the Huntsville Marriott Hotel from some undisclosed date in 1997 until April 14, 2000.[10] Throughout her employment, Ken Turner, a white male who was Head of Security and Night Manager, was plaintiff's immediate supervisor.[11] Plaintiff's duties included patrolling the hotel's property, checking doors to ensure that each was secured, and preventing theft of property by employees and guests.[12] Plaintiff also was responsible for drafting and submitting incident reports in the event of an accident entailing property damage or personal injury on the hotel's premises.[13]

## A.    The June 16, 1999 Pool Party

During the summer of 1999, the Huntsville Marriott hosted pool parties on Wednesday evenings.[14] Several employees and managers were assigned to work during each party, including

---

[4] *Id.*, Tab 2 (Ragsdale deposition), at 9.

[5] *Id.* at 30.

[6] *Id.*

[7] *Id.* at 14-15; *see also id.*, Tab 5 (Rollins deposition), at 18.

[8] Plaintiff's evidentiary submissions, Tab 6 (Comstock letter 6/25/98), at 1.

[9] *Id.*, Tab 3 (Comstock deposition), at 29; Tab 5 (Rollins deposition), at 34.

[10] *Id.*, Tab 1 (Jones deposition), at 17, 70, 78.

[11] *Id.* at 26-27, 75.

[12] *Id.*, Tab 4 (Turner deposition), at 24.

[13] Plaintiff's evidentiary submissions, Tab 2 (Ragsdale deposition), at 9.

[14] *Id.*, Tab 4 (Turner deposition), at 41.

a "manager on duty."[15]  Chief Engineer Matt Comstock was designated the "manager on duty" for the June 16, 1999 party.[16]  Plaintiff worked as a security guard that night.[17]

Despite a hotel policy prohibiting the consumption of alcohol by employees while on duty, Comstock began drinking around 10 p.m., imbibing four margaritas and a shot of "Jaegermeister."[18] Later in the evening, the party moved inside, to the hotel bar.[19]  After entering the bar, Comstock learned that Huntsville police were conducting a "sting" operation on the roof, and that some guests were complaining about the noise.[20]  Comstock directed another employee, Tom Bailey, to give him a set of hotel keys, so that he could investigate the disturbance.[21]  Bailey apparently did not respond to the directive in a manner that was satisfactory to Comstock, because Comstock began to scream at Bailey, demanding that he give him the keys.  Another employee, Jerry Ortiz, intervened and argued with Comstock.[22]  Comstock responded by approaching Ortiz in an aggressive manner, "put[ting] his nose on Ortiz's nose."[23]  Comstock continued shouting until Steve Stokes, another hotel security guard, escorted him out of the bar.[24]  Comstock later reentered the bar, however, and began shaking David Hamilton, the food and beverage director.[25]  Another security guard working

---

[15] Id., Tab 2 (Ragsdale deposition), at 60-61; Tab 5 (Rollins deposition) at 69-70.

[16] Id., Tab 5 (Rollins deposition), at 41-42.

[17] Id., Tab 4 (Turner deposition), at 44.

[18] Plaintiff's evidentiary submissions, Tab 2 (Ragsdale deposition), at 62-64; Tab 3 (Comstock deposition), at 64.

[19] Id., Tab 3 (Comstock deposition), at 65.

[20] Id. at 65-67.

[21] Id., Tab 5 (Rollins deposition), at 110.

[22] Id. at 110, 117.

[23] Plaintiff's evidentiary submissions, Tab 5 (Rollins deposition), at 117-18.

[24] Id., at 97-98.

[25] Id. at 98; see also id., Tab 1 (Jones deposition), at 53.  According to one witness, Hamilton appeared to have blood on his shirt, although it is not clear that Comstock's "shaking" was the source of that blood.  Id., Tab 5 (Rollins deposition), at 100.

the party, Keith Kruse, grabbed Comstock and separated him from Hamilton.[26]  Comstock then

moved into the hotel lobby, where he fought with another hotel security guard, Tom Newby.  During

the fray, Comstock's wife, Carolyn, jumped on Newby's back and tried to choke him.[27]  While

several employees and hotel guests attempted to separate Comstock and Newby,[28] plaintiff ordered

Carolyn Comstock to "get off" Newby.[29]  Once Mrs. Comstock dismounted, plaintiff escorted her

outside the hotel.  Meanwhile, employee Michael Tony and security guard Steve Stokes managed

to separate Newby and Comstock.

Comstock then walked outside the hotel, but again approached David Hamilton.  The two

argued, and Comstock struck Hamilton twice in the chest.  Plaintiff stepped between the two men,

turned to Comstock, and restrained him by embracing him in a hug.  Plaintiff told Comstock that he

had to stop fighting.[30]  Undeterred, Comstock attempted to punch Hamilton again, but missed, and

inadvertently hit plaintiff in the chest.

After breaking up the Comstock/Hamilton fight, plaintiff escorted Comstock down the

sidewalk and tried to convince him to go home.  Instead, Comstock walked toward a telephone pole,

and began to bang his head on a sign that was attached to the pole.[31]  Comstock then sprinted back

into the hotel and announced that he wanted "those fucking Mexicans and fucking niggers" off his

property.[32]  Plaintiff telephoned her supervisor, Ken Turner, who told her to call Cindy Reid, then

---

[26] *Id.* at 98.

[27] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 51-52.

[28] *Id.*, Tab 1 (Jones deposition), at 51.

[29] *Id.* at 52.

[30] *Id.* at 53.

[31] *Id.* at 54.

[32] *Id.*  This court notes that Comstock also is alleged to have uttered the racial epithet "nigger" in another civil action filed on Jan. 26, 2001, *McCrary v. USA Healthcare, Inc.*, No. CV-01-S-0262-NE.

the hotel's acting general manager.[33]  Plaintiff did so, and Reid instructed her to "clear out" the front office.[34]   Plaintiff removed everyone from the front office except herself, Stokes, Tony, and Comstock, who was talking to Reid on the telephone.[35]  Comstock also spoke by telephone with Jane Rollins, Director of Human Resources, and told her that he was drunk.[36]

Meanwhile, Comstock's wife attempted to enter the front office.  Plaintiff stood in the doorway, explaining that no one else was allowed inside.  Mrs. Comstock grabbed the door and swung it at plaintiff.  Plaintiff attempted to stop the door with her hand, and her thumb was injured.  Mrs. Comstock then attacked plaintiff.  The two moved out into the hallway, fighting.  Comstock, Stokes, and Tony ran out of the front office, and Comstock began to shout insults at plaintiff, calling her a "mother-fucker," a "nigger," and threatening to kill her.[37]  He bolted toward plaintiff, tackled her, and slammed her into a wall.  Hotel employees, guests, and the police intervened and separated Comstock from plaintiff.

The next morning, Rollins telephoned plaintiff at her home to check on her condition, and to ensure that she had made an appointment to be examined by a physician.[38]  Plaintiff asserts that she suffered injuries to her thumb, neck, and back as a result of the foregoing events.  On the date of plaintiff's deposition, January 16, 2002, she still had a state worker's compensation claim pending against defendant.[39]

Rollins investigated the pool party debacle and, on June 18, 1999, terminated Comstock for

---

[33] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition) at 54.

[34] *Id.* at 55.

[35] *Id.*, Tab 1 (Jones deposition), at 55, 57.

[36] *Id.*, Tab 5 (Rollins deposition), at 46-47.

[37] *Id.*, Tab 1 (Jones deposition), at 56-57.

[38] *Id.*, Tab 5 (Rollins deposition), at 54.

[39] *Id.*, Tab 1 (Jones deposition), at 56, 63-64.

"gross misconduct."[40]

## B.    The New Year's Eve Party

The Huntsville Marriott hosted a party on December 31, 1999, the eve of the new millennium, which was attended by approximately four to five hundred people.[41]   According to company policy, no former employee is allowed on hotel premises, even in a social setting, during the six month period following his or her termination.[42]   The party was scheduled to occur a couple of weeks past Comstock's six-month period of exile.[43]   Comstock telephoned Rollins nevertheless, and requested permission to attend.[44]   Rollins consented, but informed the hotel's Executive Committee and security staff (including plaintiff) that Comstock would be present.[45]   Plaintiff appeared "a little agitated," and questioned the wisdom of allowing Comstock to attend.[46]   Plaintiff's supervisor, Ken Turner, told her to contact him if she had any problems.[47]

Comstock spoke to plaintiff several times during the party.[48]   When he first approached her, and called her by name, plaintiff did not respond.   Obviously angered by the rebuff, Comstock called her a "nigger."[49]   Later, Comstock walked up to plaintiff and said, "I know you heard me talking to you," and again called her a "nigger."[50]   Comstock's wife intervened:   she pulled the back of her

---

[40] Plaintiff's evidentiary submissions, Tab 5 (Rollins deposition), at 34; Tab 7 (Comstock termination report).

[41] Id., Tab 4 (Turner deposition), at 86-87, 96-97.

[42] Id., Tab 2 (Ragsdale deposition), at 59.

[43] Id., Tab 5 (Rollins deposition), at 148.

[44] Id., Tab 2 (Ragsdale deposition), at 79-80.

[45] Id., Tab 5 (Rollins deposition), at 147, 150;  Tab 4 (Turner deposition), at 80, 83.

[46] Plaintiff's evidentiary submissions, Tab 4 (Turner deposition), at 90.

[47] Id. at 91.

[48] Id., Tab 1 (Jones deposition), at 39-40.

[49] Id. at 30.

[50] Id. at 36.

husband's coat and told him to leave plaintiff alone.[51]  Plaintiff reported this incident to a fellow employee, identified only as "Mrs. Edneva."[52]  Still later in the evening, Comstock again taunted plaintiff, once more referring to her as a "nigger," but she ignored him.[53]

Plaintiff complained to Turner "about five or six times" that Comstock was following her around the party, and taunting her with racial slurs.[54]  On each occasion, Turner instructed plaintiff to ignore Comstock,[55] to proceed with her normal duties, and said that he would attempt to find Comstock.[56]  Turner claims that he did not observe Comstock and plaintiff near one another during the party.[57]

Plaintiff also complained to General Manager Steve Ragsdale about Comstock's behavior.[58]  Ragsdale testified that he doubted the veracity of plaintiff's complaints because, although plaintiff complained that Comstock was "following her around," he (like Turner) never observed the two of them together.[59]

Finally, as plaintiff was patrolling the parking lot, Comstock called out plaintiff's name and kept saying "whatever he was saying."[60]  The following day, plaintiff filed a report with the Huntsville Police Department, accusing Comstock of harassment.[61]

## C.   The January Meeting Between Hotel Management and Plaintiff

[51] *Id.*

[52] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 36.

[53] *Id.*

[54] *Id.* at 43.

[55] *Id.* at 44.

[56] *Id.*, Tab 4 (Turner deposition), at 96, 98.

[57] *Id.* at 101-02.

[58] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 44.

[59] *Id.*, Tab 2 (Ragsdale deposition), at 86, 90-92.

[60] *Id.*, Tab 1 (Jones deposition), at 40.

[61] *Id.* at 85-86.

Ragsdale summoned plaintiff to a meeting on January 14, 2000, for the purpose of discussing the harassment complaint she had filed against Comstock with the Huntsville Police Department. Ragsdale, Turner, plaintiff, and human resources representative Michelle Roth attended the meeting.[62] Plaintiff was admonished to report incidents that occurred while she was on duty to hotel management before filing a police report and, further, not to "stir up" her fellow employees.[63] Following the meeting, a memorandum summarizing these points was drafted, and plaintiff was given a copy. No further action of a tangible nature was taken against plaintiff. Corporate Director for Human Resources Jane Rollins referred to the memorandum during deposition as a "reprimand."[64]

### D.    Plaintiff's Job is Eliminated

During April of 2000, Azar entered into an agreement with Weiser Security for the performance of all security duties at the Huntsville Marriott, thereby eliminating the need for in-house security guards.[65] At the time, the hotel's only regular security officers consisted of plaintiff and another part-time security guard, Jonathon Embry.[66]

### E.    Other Racially Offensive Incidents

#### 1.    The Spitani incident

During a Christmas party held at the Huntsville Marriott in 1998, a year prior to the preceding events, and while Kevin LaTone still was general manager of the hotel, LaTone directed plaintiff to go to the back hall and ask someone to bring out more dishes. When plaintiff delivered

---

[62] *Id.* at 112.

[63] Plaintiff's evidentiary submissions, Tab 20 (Ragsdale memo dated Jan. 14, 2000).

[64] *Id.*, Tab 5 (Rollins deposition), at 167-68.

[65] *Id.*, Tab 2 (Ragsdale deposition), at 32, 167.

[66] *Id.* at 34; Tab 4 (Turner deposition), at 144.

the message to the banquet manager, he said, "Nigger, get them yourself. Fuck you."[67]   Plaintiff could not identify Spitani's race.  She also did not report the incident to management.

### 2.    The holiday poster incident

In the fall of 1999, plaintiff noticed that a poster placed on a hotel bulletin board, displaying various holidays — including Kwanza, various Jewish holidays, and Martin Luther King Day — had been defaced.[68]   Someone had written the phrase "wacky holidays" on the poster.[69]   Plaintiff photographed the poster and reported the incident to management.  The poster subsequently was removed and hotel employees were required to attend a diversity sensitivity class.[70]

Plaintiff's job was eliminated on April 14, 2000.  She filed an EEOC charge against Azar on September 5, 2000,[71] and commenced the present action on March 7, 2001.

## II. DISCUSSION

Plaintiff brings two claims against defendant Azar:  racially hostile work environment and retaliation in response to her complaints about that environment, all in violation of Title VII and 42 U.S.C. § 1981.

### A.    Hostile Work Environment

The Eleventh Circuit has held that § 1981, as amended by the Civil Rights Act of 1991, encompasses claims for a racially hostile work environment.  *See Jackson v. Motel 6 Multipurpose, Inc.* 130 F.3d 999, 1008 n.17 (11th Cir. 1997) (citing *Vance v. Southern Bell Telephone & Telegraph Co.*, 983 F.2d 1573, 1575 (11th Cir. 1993) (observing that the 1991 Act enlarged the scope of § 1981

---

[67] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 50.

[68] *Id.* at 79-80.

[69] *Id.* at 79-80; *see also id.*, Tab 4 (Turner deposition), at 148.

[70] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 79-80.

[71] *Id.*, Tab 25 (Jones' EEOC charge).

to include post-hiring discrimination); *Dennis v. County of Fairfax*, 55 F.3d 151, 155 (4th Cir. 1995) (holding that § 1981, as amended, now covers "general conditions of employment, including incidents of racial discrimination in the workplace"); *Johnson v. Uncle Ben's Inc.*, 965 F.2d 1363, 1372 (5th Cir. 1992) ("Under § 1981 as amended by the [1991] Act, racial discrimination and other discrimination in an employment relation occurring after contract formation is actionable.")).

The elements of a racially hostile work environment claim are the same, regardless of whether the claim is viewed through the lens of Title VII or § 1981. *See Vance*, 863 F.2d at 1509 n.3 ("[T]he legal elements of a disparate treatment claim are identical under Title VII and § 1981.") (citing *Lincoln v. Board of Regents of the University System of Georgia*, 697 F.2d 928, 935 n.6 (11th Cir. 1983) ("When . . . the plaintiff predicates liability under Title VII on disparate treatment, the legal elements of the claim are identical to those of a claim under § 1981.")); *see also, e.g., Hamilton v. Rodgers*, 791 F.2d 439, 442 (5th Cir. 1986) (holding that, when sections 1981 and 1983 "are used as parallel causes of action with Title VII, they require the same proof to show liability").

## 1.   Timeliness of hostile work environment claim

A plaintiff must satisfy a number of administrative prerequisites before filing a suit based upon Title VII.  Foremost among these is the requirement that a charge of discrimination be submitted to the Equal Employment Opportunity Commission within 180 days "after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1); *see also, e.g., Alexander v. Fulton County*, 207 F.3d 1303, 1332 (11th Cir. 2000) ("No action alleging a violation of Title VII may be brought unless the alleged discrimination has been made the subject of a timely-filed EEOC charge.").  Here, the last discriminatory event that plaintiff complains of occurred during the New Year's Eve party that ended on the morning of January 1, 2000.  Plaintiff did not file her EEOC

-11-

charge until September 5, 2000, more than eight months later. Thus, her Title VII hostile work environment claim was *not* timely.

Fortunately for plaintiff, there are no administrative prerequisites to filing suit under § 1981. Neither the filing of an EEOC charge of discrimination within 180 days of the alleged unlawful employment practice, nor "resort to Title VII's administrative machinery are . . . prerequisites for the institution of a § 1981 claim." *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 460, 95 S. Ct. 1716, 1720, 44 L. Ed. 2d 295 (1975). Even so, a plaintiff still must file suit within the applicable statute of limitations.

Unlike Title VII, § 1981 does not contain an express statute of limitations. As a result, the Supreme Court instructs district courts to "select the most appropriate or analogous state statute of limitations" from the state in which the allegedly discriminatory act occurred. *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 660-61, 107 S. Ct. 2617, 2620, 2621, 96 L. Ed. 2d 572 (1987); *see also Wilson v. Garcia*, 471 U.S. 261, 266-68, 105 S. Ct. 1938, 1941-43, 85 L. Ed. 2d 254 (1985). In Alabama, that limitations period is two years. *See Peterson v. BMI Refractories*, 132 F.3d 1405, 1414 n.16 (11th Cir. 1998) (holding that § 1981 intentional discrimination claims arising out of acts occurring in Alabama are governed by Alabama Code § 6-2-38(l) (1975), the state's general, two-year limitations period applicable to personal injury actions); *see also Goodman*, 482 U.S. at 661-64, 107 S. Ct. at 2620-22 (holding that the court of appeals correctly applied Pennsylvania's two year statute of limitations for personal injury actions to § 1981 claims).

"Federal law determines when a federal civil rights action accrues. The general federal rule is that 'the statute [of limitations] does not begin to run until the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his

rights.'" *Rozar v. Mullis*, 85 F.3d 556, 561-62 (11th Cir. 1996) (race discrimination claims founded upon 42 U.S.C. §§ 1983, 1985, and 2000d *et seq.*) (quoting *Mullinax v. McElhenney*, 817 F.2d 711, 716 (11th Cir. 1987) (§ 1983 claims)); *see also, e.g., Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1390 (11th Cir. 1982) ("The limitations period for § 1981 employment discrimination cases 'commences when the plaintiff knows or reasonably should know that the discriminatory act has occurred, the same point from which the Title VII 180-day limitations period runs.'") (quoting *McWilliams v. Escambia County School Board*, 658 F.2d 326, 330 (5th Cir., Unit B 1981));[72] *Welch v. Delta Air Lines, Inc.*, 978 F. Supp. 1133, 1137 (N.D. Ga. 1997) (holding that a plaintiff's § 1981 racially hostile work environment claim was governed by Georgia's two-year statute of limitations for personal injury actions, and that the statute began to run "when the plaintiff-employee knew or reasonably should have known that the discriminatory act occurred.").

Here, plaintiff filed suit on March 7, 2001. The events constituting her hostile work environment claim occurred between December of 1998 and January 1, 2000. In other words, plaintiff filed suit within two years of some of the events which constitute her § 1981 claim, but not all. Plaintiff's claim, nevertheless, is deemed timely as to all of the events.

> [A] hostile work environment claim should be reviewed in its entirety, so long as one of the events comprising it fell within the statute of limitations. Specifically, [as the [Supreme] Court [recently] emphasized:
>
> > A hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1). . . . It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may

---

[72] In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of the Unit B panel of the former Fifth Circuit handed down after September 30, 1981. *McWilliams v. Escambia Co. School Bd.*, was such a decision, being decided on Oct. 5, 1981.

be considered by a court for the purposes of determining liability.

> [*National Railroad Passenger Corp. v. Morgan*, ___ U.S. ___, 122 S. Ct. 2061, 2074, 153 L. Ed. 2d 106 (2002).] In making this ruling, the Court essentially rejected the "continuing violation doctrine" and simplified the law by allowing courts to view allegations of hostile work environment as "a single unlawful employment practice." *Id.* at 2075. Put simply, if the smallest portion of that "practice" occurred within the limitations time period, then the court should consider it as a whole.

*Shields v. Fort James Corp.*, 305 F.3d 1280, 1281-82 (11th Cir. 2002). Accordingly, the court will consider all of the events that plaintiff complains of when evaluating her hostile work environment claim.

### 2.   Prima facie case

"In order to prove a claim for a racially hostile work environment, a plaintiff must 'demonstrate that the actions of the defendant[] altered the conditions of the workplace, creating an objectively abusive and hostile atmosphere.'" *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1008 n.17 (11th Cir. 1997) (quoting *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995)); *see also, e.g., Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002) (holding, in the context of a suit brought by a Mexican-American plaintiff, that a national origin "hostile work environment claim under Title VII is established upon proof that 'the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'") (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).

A prima facie racially hostile work environment case has five elements: (1) the employee belongs to a class of persons protected by § 1981; (2) the employee was subjected to unwelcome

harassment; (3) the harassment complained of was based upon the employee's race; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and created a discriminatorily abusive working environment; and (5) the employer is responsible under a theory of either direct or vicarious liability. *See, e.g., Bivins v. Jeffers Vet Supply*, 873 F. Supp. 1500, 1507 (M.D. Ala. 1994). *Cf. Miller*, 277 F.3d at 1275 (harassment based on the plaintiff's national origin); *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982) (sexual harassment).

Plaintiff, as an African American female, clearly is within the protective ambit of § 1981. Further, the acts she complains of were not welcome. It also is clear that the events were motivated by a racial animus, as blatantly offensive racial slurs were uttered in three incidents, and the fourth involves the defacement of an ethnic holiday poster. The fourth and fifth prima facie elements require more extended analysis, however.

The fourth element of a prima facie case — *i.e.*, the harassment was sufficiently severe or pervasive as to alter the terms and conditions of plaintiff's employment — contains both an objective and subjective component. To be actionable, a plaintiff must show not just that she subjectively believed the environment to be hostile or abusive, but that a reasonable person also would perceive it as such. *See, e.g., Harris v. Forklift Sytems, Inc.*, U.S. 17, 21-22, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993). When evaluating the objective severity of the harassment, district courts must examine all of the circumstances, which may include such factors as: the frequency of the discriminatory conduct; its severity; whether the conduct was physically threatening or humiliating, or merely an offensive utterance; and, whether the conduct unreasonably interfered with the plaintiff's work performance. *Id.* at 23, 114 S. Ct. at 371; *see also, e.g., Miller*, 277 F.2d at

-15-

1276; *Allen v. Tyson Foods*, 121 F.3d 642, 647 (11th Cir. 1997); *Edwards*, 49 F.3d at 1521.

The fifth element of a prima facie case was clarified by the Supreme Court in two decisions delivered on the same day, *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 141 L. Ed. 2d 662 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). "Although *Faragher* and *Ellerth* involved sexual harassment, the principles established in those cases apply with equal force to [a] case of racial harassment . . . ." *Wright-Simmons v. City of Oklahoma City*, 155 F.3d 1264, 1270 (10th Cir. 1998); *see also Faragher*, 524 U.S. at 787 n.1, 118 S. Ct. at 2283 n.1 ("Although racial and sexual harassment will often take different forms, and standards may not be entirely interchangeable, we think there is good sense in seeking generally to harmonize the standards of what amounts to actionable harassment."). The principles of liability established by *Faragher* and *Ellerth* have been summarized by the Eleventh Circuit in the following manner:

> An employer "is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662 (1998). The employer will be strictly liable for the hostile environment if the supervisor takes [a] tangible employment action against the victim. *See id.* at 807, 118 S. Ct. at 2293. However, when an employee has established a claim for vicarious liability but where no tangible employment action was taken, a defending employer may raise as an affirmative defense to liability or damages: "(a) that the employer exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 807, 118 S. Ct. at 2292-93. Where the perpetrator of the harassment is merely a co-employee of the victim, the employer will be held directly liable if it knew or should have known of the harassing conduct but failed to take prompt remedial action. *See Breda v. Wolf Camera & Video*, 222 F.3d 886, 889 (11th Cir.2000). Thus, a victim of coworker harassment must show either actual knowledge on the part of the employer or conduct sufficiently severe and pervasive as to constitute constructive knowledge to the employer. *See id.*

. . . .

Actual notice is established by proof that management knew of the harassment, whereas constructive notice will be found where the harassment was so severe and pervasive that management should have known of it. . . .

*Miller*, 277 F.3d at 1278.

### a.   The Spitani incident

Plaintiff has not demonstrated a basis for holding Azar liable for "the Spitani incident" detailed in § II(E)(1) *supra*, because she admittedly did not report this incident to management prior to filing suit.[73] Even if Spitani, whose job title was " banquet manager," were somehow found to have been plaintiff's supervisor (which he clearly was not), Azar still could avail itself of the "affirmative defense" to liability set forth in *Faragher* and *Ellerth* because:  (1) the incident involved only a single offensive utterance; (2) the incident did not result in a tangible or other adverse employment action; (3) Azar exercised reasonable care to prevent harassing behavior, as evidenced by its anti-harassment policy; and (4) plaintiff unreasonably failed to take advantage of Azar's complaint procedures.[74] *See Madray v. Publix Super Markets, Inc.*, 208 F.3d 1290, 1297-98 (11th Cir. 2000) (stating that "the Supreme Court implied that employers could meet the initial burden in determining whether they had exercised reasonable care to prevent . . . harassment by promulgating an anti-harassment policy") (citing *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2292-93, and *Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270).

### b.   The holiday poster incident

Plaintiff also has failed to demonstrate a basis for holding Azar liable for the "holiday poster

---

[73] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 50.

[74] *Id.*, Tab 28 (Azar, Inc. Associate Handbook), at 22-23 (providing that "discriminatory conduct should be reported immediately to your shift manager or manager on duty, department manager, or General Manager").

incident" described in § II(E)(2) *supra*, because Azar promptly took appropriate remedial action upon learning that the poster had been defaced. *See, e.g., Johnson v. Booker T. Washington Broadcasting Service, Inc.,* 234 F.3d 501, 510 (11th Cir. 2000) (holding that an employer is liable for co-worker harassment only "if it knew (actual notice) or should have known (constructive notice) of the harassment and failed to take remedial action") (quoting *Breda,* 222 F.3d at 889).   An unknown person wrote the offensive comment on the poster.[75] After plaintiff informed management, Azar removed the poster and required employees to attend a diversity sensitivity training class. Azar's response to her complaint thus was both prompt and effective, as evidenced by the fact that no similar events occurred during the remainder of plaintiff's employment. *See Williams v. Russell Corp.,* 218 F. Supp. 2d 1283, 1294 (M.D. Ala. 2002) (holding that "[w]hether an employer's response is sufficient depends upon, among other things, the effectiveness of the steps taken, that is, whether it was reasonably likely to prevent the misconduct from recurring").

    c.    **The pool party incident**

The pool party debacle detailed in § II(A) *supra* requires more intricate analysis. The key question in assessing Azar's liability for that incident is whether defendant Matt Comstock was plaintiff's supervisor at the time he assaulted her verbally and physically. *See Hansen v. Perry Technologies,* 206 F. Supp. 2d 1223, 1234 (S.D. Fla. 2002) (observing that "the determination of whether an individual is a supervisor vis-a-vis a discrimination plaintiff-employee is a significant one . . . [because] different standards apply where it is a supervisor doing the harassing").

Plaintiff ordinarily was not subordinate to Comstock, whose job title was Chief Engineer. Her designated supervisor was Ken Turner, Head of Security and Night Manager.[76] Turner left the

---

[75] *Id.,* Tab 1 (Jones deposition), at 80.

[76] *Id.* at 26-27.

hotel around 11 p.m. on the night of the party, however.[77]  The issue that thus presents itself is whether Comstock's designation as the hotel's "manager on duty" made him plaintiff's supervisor after Turner departed the premises.  For the purpose of holding Azar vicariously liable for the acts of Comstock, plaintiff bears the burden of showing a genuine issue of material fact as to whether Comstock was her supervisor.  *See, e.g., Jackson v. T & N Van Service,* 86 F. Supp. 2d 497, 501 (E.D. Pa. 2000).

The delineation of those persons who may be classified as "supervisors" can prove difficult. Prior to the Supreme Court's decisions in *Faragher* and *Ellereth,* some courts defined the term in a manner that included a person who exercised control over a plaintiff's daily activities or duties, even if the putative supervisor did not have the power to make hiring, firing, or promotion decisions. *See, e.g., Grozdanich v. Leisure Hills Health Center, Inc.,* 25 F. Supp. 2d 953, 971 (D. Minn. 1998) (holding that the term "supervisor" includes persons with control over an employee's daily activities, and who have power to recommend disciplinary action); *Sims v. Montgomery County Commission,* 766 F. Supp. 1052, 1069 (M.D. Ala. 1990) ("A supervisor need not necessarily be high in the business structure, nor does he have to have the authority to hire, fire, or promote in order to be considered an agent whose conduct is binding on an employer.").  Although the Supreme Court has not specifically defined the term for purposes of determining an employer's liability for a hostile work environment, the *Faragher* Court indicated that supervisors possess the power "to hire and fire, and to set work schedules and pay rates."  *Faragher,* 524 U.S. at 803, 118 S. Ct. at 2291.[78]

---

[77] *Id.,* Tab 4 (Turner deposition), at 43-44.

[78] In context, the *Faragher* Court said:

> We therefore agree with Faragher that in implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible for abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an appropriate starting point for determining liability for the kind of harassment

Other courts have defined the term as meaning those persons who possess the power to hire, fire, demote, promote, transfer, or discipline an employee. *See, e.g., Parkins v. Civil Constructors of Illinois*, 163 F.3d 1027, 1033 (7th Cir. 1998) ("Absent an entrustment of at least some of this authority, an employee does not qualify as a supervisor for purposes [of] imputing liability to the employer.").[79]

The EEOC struck a middle course, saying that a person qualifies as an employee's supervisor if: "**a.** the individual has authority to undertake or recommend tangible employment decisions affecting the employee; or **b.** the individual has authority to direct the employee's daily activities." *EEOC Enforcement Guidance: Vicarious Liability for Unlawful Harassment by Supervisors*, FEP Man. (BNA) 915.002 at 5 (Jun. 18, 1999); *see also Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1265 (M.D. Ala. 2001) (defining "supervisor" as a person "who has the actual authority to take tangible employment actions, or to recommend tangible employment actions if his

---

presented here. . . . The agency relationship affords contact with an employee subjected to a supervisor's sexual harassment, and the victim may well be reluctant to accept the risks of blowing the whistle on a superior. When a person with supervisory authority discriminates in the terms and conditions of subordinates' employment, his actions necessarily draw upon his superior position over the people who report to him, or those under them, whereas an employee generally cannot check a supervisor's abusive conduct [in] the same way that she might deal with abuse from a co-worker. When a fellow employee harasses, the victim can walk away or tell the offender where to go, but it may be difficult to offer such responses to *a supervisor, whose "power to supervise —* [*which may be*] *to hire and fire, and to set work schedules and pay rates —* does not disappear . . . when he chooses to harass through insults and offensive gestures rather than directly with threats of firing or promises of promotion." Estrich, *Sex at Work*, 43 Stan. L. Rev. 813, 854 (1991). Recognition of employer liability when discriminatory misuse of supervisory authority alters the terms and conditions of a victim's employment is underscored by the fact that the employer has a greater opportunity to guard against misconduct by supervisors than by common workers; employers have greater opportunity and incentive to screen them, train them, and monitor their performance.

*Faragher v. City of Boca Raton*, 524 U.S. 775, 802-03, 118 S. Ct. 2275, 2290-91, 141 L. Ed. 2d 662 (1998) (footnote and some citations omitted) (emphasis added).

[79] In *Parkins*, the Seventh Circuit noted that the two alleged harassers were members of labor unions, were paid hourly wages, accounted for their work hours on time cards, and did not substitute for absent supervisors on constructions projects, and, although they sometimes functioned as "foremen," they more often worked as laborers. Accordingly, they were deemed co-employees of the plaintiff.

or her recommendations are given substantial weight by the final decisionmaker, or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or triggers the assignment of additional or undesirable tasks").[80]

During deposition, plaintiff was questioned regarding her workplace interactions with Comstock in the following manner:

Q:     [Comstock] was not your supervisor?

A:     No, sir.

Q:     Never exerted any supervisory authority over you?

A:     If I worked the door at Otter's [the hotel bar], he would come and collect the money from me.

Q:     Is that all?

A:     Or ask me to do something if something needed to be done which was part of my job.

Q:     But your supervisor was Ken Turner?

A:     Yes, sir.[81]

In other words, the only workplace interaction that Comstock had with plaintiff was that he sometimes collected money from her, or asked her "to do something if something needed to be done *which was part of* [plaintiff's] *job*." There is no evidence that Comstock otherwise possessed

---

[80] These same holdings were reiterated in the *Dinkins* opinion, with elucidating citations, as follows:

> The court finds that an employee is a supervisor or 'agent" for purposes of Title VII if he has the actual authority to take tangible employment actions, *see Ellerth*, 524 U.S. at 762, 118 S. Ct. 2257, or to recommend tangible employment actions if his recommendations are given substantial weight by the final decisionmaker, *see id.*, or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks, *see Johnson*, 234 F.3d at 513.

*Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1254, 1266 (M.D. Ala. 2001).

[81] *Id.,* Tab 1 (Jones deposition), at 59.

-21-

authority to direct plaintiff's daily duties, administer discipline, or recommend (much less take) tangible employment actions affecting her employment.

Further, Comstock's drunken tirade was not an activity that was facilitated, or "aided," by his authority as the "manager on duty."

> In one sense . . . a supervisor is always aided by the agency relationship because the supervisor's power and authority "invests his or her harassing conduct with a particular threatening character." But there are also some acts a supervisor might commit that are identical to conduct in which a co-employee might engage, and the supervisor's status would make little difference.

*Gawley v. Indiana University*, 276 F.3d 301, 310 (7th Cir. 2001) (internal citation omitted); *see also Mikels v. City of Durham,* 183 F.3d 323, 331-32 (4th Cir. 1999) ("The fundamental determinant of . . . vicarious liability is not . . . the harasser's formal rank vis-a-vis that of the victim . . . but whether the particular conduct was aided by the agency relation.") (internal quotation marks and citation omitted). Comstock's actions are not the type contemplated to confer liability on a non-negligent employer. *See, e.g., Sparks v. Pilot Freight Carriers, Inc.*, 830 F.2d 1554, 1559 (11th Cir. 1987).

For all of the foregoing reasons, this court concludes that Comstock was *not* plaintiff's supervisor on the night of the pool party, for purposes of imposing vicarious liability upon Azar. *See Parkins*, 163 F.3d at 1034 (holding that "[c]ases subsequent to *Faragher* and *Ellerth* indicate that whether an individual is a supervisor with immediate (or successively higher) authority is dependent upon whether his authority was of a *substantial magnitude*") (emphasis supplied); *Hall v. Bodine Electric. Co.*, 276 F.3d 345, 354-55 (7th Cir. 2002) (holding that the fact that harasser had a minimal amount of discretion over plaintiff's work was not sufficient to impute Title VII vicarious liability to employer); *Mikels*, 183 F.3d at 334 (holding that harasser's superior rank to plaintiff, coupled with his occasional authority to direct her work duties, did not render harasser plaintiff's

supervisor because plaintiff had immediate access to her designated supervisor "without going through [harasser] or anyone else to lodge grievances"); *Dominicak-Brutus v. Urban Property Services Co.*, 217 F. Supp. 2d 911, 922 (N.D. Ill. 2002) (holding that while harasser occasionally assigned plaintiff work, he was not her supervisor because harasser did not have the authority to affect the terms or conditions of plaintiff's employment); *Jackson*, 86 F. Supp. 2d at 502 (holding that harassers were not the plaintiff's supervisors merely because they were higher in the chain of command and, thus, were able to direct plaintiff's actions, where plaintiff consistently identified another individual as his immediate supervisor, and reported exclusively to that individual).

The next question that must be addressed is whether Azar can be held liable for Comstock's behavior on the night of the pool party under the more lenient negligence standard, which imposes liability upon an employer "if it knew or should have known of the harassing conduct but failed to take prompt remedial action." *Miller,* 277 F.3d at 1278 (citing *Breda,* 222 F.3d at 889). There is no evidence that Azar had any prior notice of Comstock's propensity for such behavior. Further, Azar swiftly terminated Comstock upon learning the details of the pool party fiasco. It thus acted promptly and appropriately.

If the events of June 16, 1999 were the only conduct in issue, therefore, Azar could escape liability. The debacle should not be viewed in isolation, however, but in conjunction with those events occurring at the dawning of the new millennium.

### d.    The New Year's Eve party

Comstock attended this event as a paying guest. Accordingly, the first issue that must be addressed is whether Azar can be held liable to plaintiff for the actions of a person who was not then its employee. While the lion's share of cases addressing the standard for determining the liability

of an employer for the harassment of employees by third-parties arose in the context of sexual harassment claims, this court finds that the legal standards established by those decisions are equally applicable to a case involving racially motivated harassment. *Cf., e.g., Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1074 (10th Cir. 1998) (holding that, "because harassment by customers is more analogous to harassment by co-workers than by supervisors, we hold the same standard of liability applies to both co-worker and customer harassment"); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 766 (2d Cir. 1998) (explaining that "[t]hough we need not decide the precise contours of the duty, if any, that employers owe to employees who are subjected to harassment by outsiders such as customers, such a duty can be no greater than that owed with respect to co-worker harassment"); *Rodriguez-Hernandez v. Miranda-Velez*, 132 F.3d 848, 854 (1st Cir. 1998) (stating that "employers can be held liable for a customer's . . . [harassment], if the employer ratifies or acquiesces in the customer's demands"); *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754, 756 (9th Cir. 1997) (holding that "an employer may be held liable for sexual harassment on the part of a private individual . . . where the employer either ratifies or acquiesces in the harassment by not taking immediate and/or corrective action when it knew or should have known of the conduct"). Further, EEOC regulations provide that an "employer may also be responsible for the acts of non-employees, with respect to . . . harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action." 29 C.F.R. § 1604.11(e) (1997) (addressing sexual harassment).

A hostile work environment claim *may* be actionable even if only one incident of harassment occurs, provided such harassment is of sufficient severity. *See, e.g., Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000) (holding that "even one act of harassment will suffice [to

maintain a hostile work environment claim] if it is egregious"); *Daniels v. Essex Group. Inc.*, 937 F.2d 1264, 1273-74 (7th Cir. 1991) (holding that there is no "'magic' threshold number of incidents" that must be alleged to prove the existence of a hostile work environment); *Greene v. Columbia Univ.*, No. 99 CIV.4734 WK RLE, 2002 WL 31235796, at *7 (S.D.N.Y. Sept. 30, 2002) (holding that, "generally, the more severe the conduct, the fewer instances required to create a hostile work environment") (citation omitted).

"[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126 L. Ed. 2d 295 (1993). As previously noted, the factors to consider in this analysis include, but are not limited to: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.*

Here, plaintiff claims that Comstock followed her around during the party and, on at least three occasions, uttered racial slurs. Given Comstock's previous assault on plaintiff, this court finds that reasonable jurors could conclude such conduct was physically threatening and humiliating. Moreover, three references to a person of African ancestry by use of the patently offensive term "nigger" reasonably could be characterized as severe.

Plaintiff contends that genuine issues of material fact exist as to: (a) whether Azar was negligent in permitting Comstock to attend the New Year's party, given the egregious nature of his conduct during the pool party; and (b) whether Azar took prompt and effective action in response to the complaints she lodged during the party.[82] This court agrees.

---

[82] Plaintiff's brief opposing summary judgment, at 30.

At deposition, plaintiff testified that she complained to Turner "about five or six times" during the course of the evening, telling him that Comstock was following her around and calling her the "n-word."[83]  Plaintiff says that Turner's only response was that she should "[i]gnore him."[84] Plaintiff also complained about Comstock to the hotel's general manager, Steve Ragsdale, on one occasion during the party.[85]  Both Turner and Ragsdale attempted to explain their respective failures to take more affirmative, corrective action by saying that they never observed plaintiff and Comstock together at any time during the party.[86]

Taking plaintiff's version of the facts as true, however, this court finds that reasonable jurors could conclude that Azar was twice negligent:  that is, (a) considering Comstock's track record of violence and bigotry, exacerbated by the fact that he was allowed to attend an event where alcohol was served, a reasonable juror could conclude that it was negligent for Jane Rollins to grant his request to attend the New Year's party in the first instance; and (b) reasonable jurors, depending upon who they believed, could conclude that Turner and Ragsdale failed to take prompt and appropriate corrective action in response to plaintiff's complaints.

Accordingly, this court concludes that Azar's motion for summary judgment must be denied with regard to plaintiff's racial harassment claims based upon the events occurring during the June 16, 1999 pool party, and, the millennium New Year's Eve party.

## B.    Retaliation

Plaintiff's brief asserts that she was "counseled, reprimanded, and threaten [sic] with

---

[83] Plaintiff's evidentiary submissions, Tab 1 (Jones deposition), at 43.

[84] *Id.* at 44.

[85] *Id.*

[86] Plaintiff's evidentiary submissions, Tab 4 (Turner deposition), at 101-02; Tab 2 (Ragsdale deposition), at 86, 90-92.

termination all in retaliation for opposing discriminatory harassment on the part of Comstock."[87]

Plaintiff's brief does not respond to defendant's argument that the elimination of all in-house security guards on April 14, 2000 was not a retaliatory act. Accordingly, plaintiff is deemed to have abandoned that claim. *See, e.g., Chapman v. AI Transport* 229 F.3d 1012, 1027 (11th Cir. 2000) (en banc) ("Parties opposing summary judgment are appropriately charged with the responsibility of marshaling and presenting their evidence before summary judgment is granted, not afterwards."); *Road Sprinkler Fitters Local Union No. 669 v. Independent Sprinkler Corp.*, 10 F.3d 1563, 1568 (11th Cir. 1994) (holding that a district court can "properly treat as abandoned a claim alleged in the complaint but not even raised as a ground for summary judgment") (citing *Lazzara v. Howard A. Esser, Inc.*, 802 F.2d 260, 269 (7th Cir. 1986) (holding that a ground not pressed in opposition to a motion for summary judgment is to be treated by the district court as abandoned)).

> In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him." *Ryan v. Int'l Union of Operating Eng'rs, Local 675*, 794 F.2d 641, 643 (11th Cir. 1986). There is no burden on the district court to distill every potential argument that could be made based upon the materials before it on summary judgment. *Blue Cross & Blue Shield v. Weitz*, 913 F.2d 1544, 1550 (11th Cir. 1990). Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned. . . .

*Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (some citations omitted).[88]

---

[87] Plaintiff's brief opposing summary judgment, at 18.

[88] *Cf., e.g., Lucas v. W.W. Grainger, Inc.* 257 F.3d 1249, 1255 n.1 (11th Cir. 2001) ("Lucas has abandoned his unlawful harassment claim by not raising it in his initial brief on appeal.") (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1317 n.17 (11th Cir. 1999) ("Issues that are not clearly outlined in an appellant's initial brief are deemed abandoned.") (citations omitted)); *Hartsfield v. Lemacks*, 50 F.3d 950, 953 (11th Cir. 1995) ("We note that issues that clearly are not designated in the initial brief ordinarily are considered abandoned.") (quotation marks and citation omitted); *Marek v. Singletary*, 62 F.3d 1295, 1298 n.2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.") (citing *Allstate Insurance Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (declining to address issue for failure of party to argue it in its brief on appeal).

The only retaliatory event in consideration, therefore, occurred on January 14, 2000: *i.e.,* the reprimand that plaintiff received for filing a harassment complaint with the Huntsville Police Department, rather than corporate management.  Plaintiff filed her EEOC charge on September 5, 2000, more than six months later.  Therefore, plaintiff's retaliation claim is not timely under Title VII, for the same reasons discussed in § II(A)(1) *supra.*  Even so, as also discussed in that same section, there are no administrative prerequisites to a § 1981 claim, and plaintiff can pursue her retaliation claim under that statute.  Although the text of 42 U.S.C. § 1981 does not contain a specific prohibition against retaliation, the Eleventh Circuit has held that retaliation claims are cognizable under that statute.  *See, e.g., Webster v. Fulton County, Georgia,* 283 F.3d 1254, 1256 (11th Cir. 2002) (holding that "[w]e have previously concluded that Section 1981 supports a retaliation cause of action") (citing *Andrews v. Lakeshore Rehabilitation Hospital,* 140 F.3d 1405, 1409-13 (11th Cir. 1998)).

To establish a prima facie case of retaliation, plaintiff must prove that: (1) she participated in activity protected by § 1981; (2) she suffered an adverse employment action; and (3) there is a causal connection between elements (1) and (2).  *Hansen v. Perry Technologies,* 206 F. Supp. 2d 1223, 1237 (S.D. Fla. 2002) (citing *Gupta v. Florida Board of Regents,* 212 F.3d 571, 587 (11th Cir. 2000) (citing in turn *Farley v. Nationwide Mut. Ins. Co.,* 197 F.3d 1322, 1336 (11th Cir. 1999))).  Once the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the contested employment action.  If this burden is met, plaintiff must then demonstrate that defendant's proffered reason is pretext for retaliation.  *See, e.g., Malone v. K-Mart Corp.,* 51 F. Supp. 2d 1287, 1307 (M.D. Ala. 1999).

Plaintiff's retaliation claim falters on the second element.  An adverse employment action

-28-

can be, but is not always, "an ultimate employment decision, such as discharge or failure to hire, or other conduct that alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Hudson v. Norfolk Southern Railway Co.*, 209 F. Supp. 2d 1301, 1334 (N.D. Ga. 2001) (discriminatory discipline case) (citing *Gupta*, 212 F.3d at 587). "Although adverse employment actions may include reprimands . . . the action in question must have more than a tangential effect on the ultimate employment decision . . . . Indeed, the conduct in question must rise to a substantial level before it can be cognizable as unlawful discrimination." *Hanley v. Sports Authority*, 143 F. Supp. 2d 1351, 1356 (S.D. Fla. 2000) (discussing a racial-disparate treatment claim) (citing *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir. 1998); *Mattern v. Eastman Kodak,* 104 F.3d 702, 708 (5th Cir. 1997); *McCabe v. Sharrett*, 12 F.3d 1558, 1563 (11th Cir. 1994)); *see also Grube v. Lau Industries, Inc.*, 257 F.3d 723, 729 (7th Cir. 2001) (holding that unfair reprimands or negative performance evaluations, unaccompanied by some tangible job consequence, do not constitute adverse employment actions); *Oest v. Illinois Department of Corrections,* 240 F.3d 605, 613 (7th Cir. 2001) (holding that, even though "each oral or written reprimand brought [plaintiff] closer to termination," they still did not form an independent basis for liability under Title VII because, "absent some tangible job consequence accompanying the reprimands, we decline to broaden the definition of adverse employment action to include them") (internal quotation mark and citation omitted).

Plaintiff correctly points out that an adverse employment action need not rise to the level of an ultimate employment decision, such as termination.[89]   *See Shannon v. Bellsouth*

---

[89] Plaintiff's brief opposing summary judgment, at 18.

*Telecommunications, Inc.*, 292 F.3d 712, 716 (11th Cir. 2002) (citing *Wideman*, 141 F.3d at 1456). Even so, an employer's contested action must reach "some threshold level of substantiability." *Shannon,* 292 F.3d at 716 (*quoting Wideman,* 141 F.3d at 1456). "While not everything that makes an employee unhappy is an actionable adverse action, conduct that alters an employee's compensation, terms, conditions, or privileges of employment does constitute adverse action under Title VII." *Shannon,* 292 F.3d at 716 (quoting *Bass v. Board of County Commissioners,* 256 F.3d 1095, 1118 (11th Cir. 2001)). "Otherwise, every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Williams v. Bristol-Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir. 1996).

Here, plaintiff has not pointed to *any* tangible consequence related to the "reprimand" that she received for filing a harassment complaint with the Huntsville Police Department and, thus, it cannot reasonably be construed as an adverse employment action. There is no evidence that her pay was cut, that her working conditions were altered, or that she suffered any detriment beyond a mere rebuke. Such a verbal scolding, with no other consequences, clearly is *not* an adverse employment action. Accordingly, her retaliation claim is due to be dismissed.

An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this **27**th day of November, 2002.

United States District Judge

-30-